Kenneth C. Burgraff, Sr. and Linda Burgraff, Plaintiffs-Respondents,

v.

Menard, Inc., Defendant-Appellant,††

Millers First Insurance Company, Defendant-Respondent,†

Walmart Stores, Inc. Associates Health and Welfare Plan, Defendant.

Court of Appeals

*No. 2013AP907. Oral argument January 21, 2014. —Decided July 29, 2014.*

2014 WI App 85

(Also reported in 853 N.W.2d 574.)

† Petition for Review filed.
†† Petition for Cross Review filed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of and oral argument by *Jeffrey S. Fertl* and *Melissa J. Lauritch of Hinshaw & Culbertson LLP* of Milwaukee.

On behalf of the defendant-respondent, the cause was submitted on the brief of and oral argument by *John C. Possi* of *Mueller, Goss & Possi, S.C.* of Milwaukee.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Martha H. Heidt* of *Bye, Goff & Rohde, Ltd.* of *River Falls*.

Before Hoover, P.J., Mangerson and Stark, JJ.

¶ 1. STARK, J. Kenneth Burgraff was injured while an employee of Menard, Inc., was loading materials onto Burgraff's trailer using a forklift. Burgraff sued Menard for damages. Menard tendered defense of Burgraff's claim to Burgraff's car insurer, Millers First Insurance Company, asserting it was entitled to coverage under the Millers First policy as a permissive user of Burgraff's vehicle. In addition to the Millers First policy, Menard had a commercial general liability policy issued by CNA, which included a $500,000 self-insured retention.

¶ 2. Menard raises two issues on appeal. First, Menard argues the circuit court erred by applying the "other insurance" clause from the Millers First policy. Pursuant to that clause, the court determined Menard and Millers First would share responsibility for paying any settlement or verdict Burgraff obtained pro rata. Menard contends the court should have instead treated Menard's self-insured retention as excess coverage, pursuant to the "other insurance" clause in the CNA policy. We conclude the circuit court properly applied the "other insurance" clause from the Millers First policy, and we affirm on this issue.

¶ 3. Second, Menard argues the circuit court erred by determining Millers First no longer had a duty to defend Menard after Millers First settled its proportionate share of Burgraff's claim. We agree with Menard that the settlement did not extinguish Millers First's duty to defend. The Millers First policy unambiguously states

the duty to defend continues until Millers First has "exhausted" its "limit of liability." Because Millers First settled for less than its policy limit, it did not exhaust its limit of liability. We therefore reverse the circuit court's decision that Millers First had no further duty to defend Menard after it settled its share of Burgraff's claim. We further conclude Millers First breached its duty to defend when it withdrew its defense of Menard following the settlement. We remand to the circuit court for a determination of Menard's damages.

## BACKGROUND

¶ 4. At the time of the accident, Burgraff's vehicle and trailer were insured under a car insurance policy issued by Millers First. The Millers First policy had a $100,000 per person liability limit. The policy's insuring agreement states:

> We will pay damages for "bodily injury" or "property damage" for which any "insured" becomes legally responsible because of an auto accident. Damages include pre-judgment interest awarded against the "insured." We will settle or defend, as we consider appropriate, any claim or suit asking for these damages. In addition to our limit of liability, we will pay all defense costs we incur. **Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted. We are not obligated to provide defense after we have paid our limits of liability in settlement of claims or suits. We have no duty to defend any suit or settle any claim for "bodily injury" or "property damage" not covered under this policy.**

The policy also contains the following "other insurance" clause:

> If there is other applicable liability insurance, we will pay only our share of the loss. Our share is the

proportion that our limit of liability bears to the total of all applicable limits. However, any insurance we provide for a vehicle you do not own shall be excess over any other collectible insurance.

¶ 5. Menard tendered defense of Burgraff's claims to Millers First, asserting it was entitled to coverage under the Millers First policy because its employee was a permissive user of Burgraff's vehicle. *See Blasing v. Zurich Am. Ins. Co.*, 2014 WI 73, 356 Wis. 2d 63, 850 N.W.2d 138. Millers First agreed to provide a defense for Menard, subject to a reservation of rights. Millers First subsequently conceded Menard was entitled to coverage under Burgraff's policy.

¶ 6. In addition to the Millers First policy, Menard was insured at the time of the accident under a commercial general liability policy issued by CNA. The CNA policy had a liability limit of $500,000 per occurrence. The policy contains an "other insurance" clause, which provides, in relevant part:

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph c. below.

**b. Excess Insurance**

(1) This insurance is excess over:

(a) Any of the other insurance, whether primary, excess, contingent or on any other basis:

. . . .

(iv) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft . . .

. . . .

(3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(a) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(b) The total of all deductible and self-insured amounts under all that other insurance.

. . . .

**c. Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

¶ 7. The CNA policy also includes a self-insured retention endorsement, which states, "In consideration

of the premium charged, it is agreed that the limits of insurance for each of the coverages provided by this policy . . . will apply excess of a self-insured retention (hereinafter referred to as the Retention Amount)[.]" The "retention amount" is $500,000 per occurrence. Under the self-insured retention endorsement, Menard is required to pay the first $500,000 worth of damages and defense costs arising from an occurrence before CNA's duties to defend and indemnify Menard take effect.

¶ 8. Millers First moved for partial summary judgment, arguing Menard's $500,000 self-insured retention qualified as "other applicable liability insurance" under the Millers First policy's "other insurance" clause. As a result, Millers First asked the circuit court to apply the "other insurance" clause and declare that Millers First's share of any verdict or settlement would be one-sixth—that is, the proportion that Millers First's liability limit ($100,000) bore to the total of all applicable limits ($600,000—comprised of Millers First's $100,000 limit plus Menard's $500,000 self-insured retention).[1] In response, Menard argued its self-insured retention should be treated as excess coverage, pursuant to the "other insurance" clause in the CNA policy. The circuit court agreed with Millers First and granted it partial summary judgment. The court held Menard would be "liable for five-sixths of any verdict or settlement and [Millers First would be liable] for one-sixth of any verdict or settlement."[2]

---

[1] It was apparently undisputed that Burgraff's damages would not exceed $600,000.

[2] In its motion for partial summary judgment, Millers First also argued Menard's defense costs should be pro rated. The circuit court rejected that argument, and Millers First does not renew it on appeal.

¶ 9. Millers First and Burgraff then settled Millers First's one-sixth portion of Burgraff's claim. Under the settlement agreement, Millers First paid Burgraff $40,000, and, in exchange, Burgraff agreed to "fully discharge Millers First Insurance Company and one-sixth of any liability that Menard, Inc. may have to [Burgraff]." Menard did not reach any settlement with Burgraff regarding the remaining five-sixths of its liability.

¶ 10. Millers First subsequently moved for summary judgment, arguing it no longer had a duty to defend Menard because it had fully satisfied its duty to pay one-sixth of any verdict or settlement.[3] The circuit court granted Millers First's motion, reasoning it did not "make any sense" to require Millers First to continue defending Menard when Millers First no longer had a duty to indemnify Menard. Menard now appeals.

## DISCUSSION

██

¶ 11. We review a circuit court's decision to grant summary judgment independently, using the same standard applied by the circuit court. *Stubbe v. Guidant Mut. Ins. Co.*, 2002 WI App 203, ¶ 6, 257 Wis. 2d 401, 651 N.W.2d 318. Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2).

---

[3] Millers First's motion was captioned as a motion to dismiss. However, it referred to facts outside the pleadings—specifically, the settlement agreement—and the circuit court relied on those facts in reaching its decision. We therefore treat the motion as a motion for summary judgment. *See* Wis. Stat. § 802.06(2)(b).

All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

¶ 12.　Here, the facts are undisputed, leaving only issues of law for our review. Interpretation of an insurance policy is a question of law that we review independently. *Stubbe*, 257 Wis. 2d 401, ¶ 7. We construe policy language from the perspective of a reasonable insured, giving the words used in the policy their common and ordinary meanings. *Id.*, ¶ 8. If policy language is unambiguous, we simply apply it as written. *Id.* However, if policy language is ambiguous—that is, susceptible to more than one reasonable interpretation—we resolve the ambiguity in the insured's favor. *Id.*

## I.　The "other insurance" clauses

¶ 13.　An insured may have different layers of insurance to cover the same risks. ARNOLD P. ANDERSON, WISCONSIN INSURANCE LAW § 11.11 (6th ed. 2010). With respect to a particular risk, each policy provides either primary or excess coverage. *See id.*, §§ 11.12–11.18. Primary coverage provides "first-dollar" liability coverage up to the primary insurance contract's limits. *Id.*, § 11.12. Excess coverage attaches only after a predetermined amount of primary coverage has been exhausted. *Id.*, § 11.14.

¶ 14.　"Whenever two policies apply to the same insured at the same time, the issue of which policy must pay first—or which is primary and which is excess—is dealt with by 'other insurance' clauses." *Id.*, § 11.3. In this case, the circuit court applied the Millers First policy's "other insurance" clause, which states, "If there is other applicable liability insurance, we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits." The court determined Menard's self-insured

retention constituted "other applicable liability insurance." The court therefore divided responsibility for paying any settlement or verdict between Millers First and Menard in proportion to their limits of liability.

¶ 15. Menard argues the circuit court should have instead applied the "other insurance" clause from the CNA policy. The CNA policy states, "This insurance is excess over . . . [a]ny of the other insurance, whether primary, excess, contingent or on any other basis . . . [i]f the loss arises out of the maintenance or use of . . . 'autos[.]' " It is undisputed that Burgraff's injuries arose out of the use of an "auto." Menard therefore contends the CNA policy provides excess coverage, not primary coverage, for Burgraff's claims. Where a proration clause in one insurance policy conflicts with an excess clause in another insurance policy, the excess clause controls. *Lubow v. Morrissey*, 13 Wis. 2d 114, 123, 108 N.W.2d 156 (1961). As a result, Menard argues the circuit court should have applied the "other insurance" clause from the CNA policy, instead of prorating coverage pursuant to the "other insurance" clause in the Millers First policy.

¶ 16. Menard's reliance on the CNA policy's "other insurance" clause is misplaced. Menard assumes that it stands in the shoes of CNA for purposes of the "other insurance" clause, and its self-insured retention is therefore excess to the coverage provided by Millers First. However, Menard does not provide any analysis or legal authority to support this assumption. *See State v. Pettit*, 171 Wis. 2d 627, 646–47, 492 N.W.2d 633 (Ct. App. 1992) (we need not consider undeveloped arguments).

¶ 17. More importantly, the language of the CNA policy unambiguously shows that the "other insurance"

292

clause does not apply to Menard's self-insured retention. The "other insurance" clause begins by stating, "If other valid and collectible insurance is available to the insured for a loss *we* cover . . . *our* obligations are limited as follows . . . ." (Emphasis added.) Elsewhere, the policy states, "Throughout this policy the words 'you' and 'your' refer to the Named Insured . . . . The words 'we,' 'us' and 'our' refer to the company providing this insurance." Thus, the "other insurance" clause governs *CNA's* obligations when other insurance is available for a covered loss. The clause does not address the priority of *Menard's* obligation to pay the self-insured retention amount when other insurance is available. Accordingly, Menard's argument that the circuit court should have applied the CNA policy's "other insurance" clause fails.

¶ 18. Menard next argues that, even if the Millers First policy's "other insurance" clause is applicable, the circuit court erred by determining that Menard's self-insured retention constitutes "other applicable liability insurance" under that clause. The circuit court relied on *Hillegass v. Landwehr*, 176 Wis. 2d 76, 499 N.W.2d 652 (1993), to support its decision.

¶ 19. In *Hillegass*, the plaintiff was injured in a motor vehicle accident involving a vehicle owned by Burlington Air Express. *Id.* at 78. Burlington was "self-insured at the time of the collision for up to $1 million with an additional $2 million umbrella policy[.]" *Id.* The vehicle's driver had his own car insurance policy through Farmers Insurance Exchange. *Id.* The Farmers policy contained an "other insurance" clause that stated, "Any insurance we provide for a vehicle you do not own shall be excess over any other collectible insurance." *Id.* Because it was self-insured, Burlington argued there was no "other collectible insurance" within

the meaning of the Farmers policy. *Id.* at 78–79. Burlington therefore argued Farmers' coverage was primary. *Id.*

¶ 20. On appeal, our supreme court observed that whether self-insurance qualified as "other collectible insurance" was an issue of first impression in Wisconsin. *Id.* at 79. The court looked to dictionary definitions of the term "insurance" to aid in its analysis. *Id.* at 81. The court concluded the critical element of the relevant definitions was "a contractual shifting of risk in exchange for premiums." *Id.* However, the court rejected Burlington's argument that "this risk-shifting necessarily implies the existence of a third-party insurer—one who undertakes the contractual duty to compensate the insured for the loss." *Id.* Instead, the court observed that self-insurers "retain their own risk in exchange for not paying premiums. . . . [T]he essence of the transaction remains the same: exchanging future liability for premium payments." *Id.* at 81–82. Quoting the circuit court, the supreme court concluded that "self insurance is just a form of insurance . . . . the modifying term 'self' just indicates where it emanates . . . ." *Id.* at 82.

¶ 21. The *Hillegass* court also explained that the "underlying public policies on which Wisconsin insurance law is based" mandated a conclusion that self-insurance qualified as "other collectible insurance." *Id.* at 81. The court identified three public policy factors supporting this conclusion.

¶ 22. First, the court observed that Burlington had chosen to retain its own risk for the first $1 million in damages in order to avoid paying premiums to a third-party insurer. *Id.* at 82. The court reasoned it would be "fundamentally unfair" to permit Burlington to self-insure "and thereby escape both the expense of

premium payments and the possibility of being held liable as primary insurer." *Id.* at 83.

¶ 23. Second, the court explained it would be "inappropriate to permit Burlington to escape liability merely because [the driver] chose to purchase an individual insurance policy when in fact Burlington would otherwise be responsible." *Id.* at 84. In other words, allowing Burlington to avoid being held liable as a primary insurer when other coverage existed by happenstance would be inconsistent with Burlington's expectations. *Id.* at 83–84.

¶ 24. Third, the court concluded allowing a self-insured party to avoid being held liable as a primary insurer was contrary to the public policy set forth in Wis. Stat. § 344.30(4) (1991–92). *Hillegass*, 176 Wis. 2d at 84–85. That statute required a certificate of self-insurance to be supplemented by an agreement that "the self-insurer will pay the same amounts that an insurer would have been obligated to pay under a motor vehicle liability policy if it had issued such a policy to such self-insurer." Wis. Stat. § 344.30(4) (1991–92). Although § 344.30(4) (1992–92), did not apply to Burlington, the *Hillegass* court stated the statute was helpful "as an expression of legislative intent with respect to self-insurers generally." *Hillegass*, 176 Wis. 2d at 84–85. The court explained § 334.30(4) (1991–92), demonstrated that "permitting individuals to self-retain risk was not intended by the legislature to be a device by which self-insurers could escape the liabilities that would attach to third-party insurers." *Hillegass*, 176 Wis. 2d at 85.

¶ 25. Under *Hillegass*, self-insurance constitutes "other collectible insurance" for purposes of an "other insurance" clause. *Hillegass* therefore supports the circuit court's conclusion that Menard's self-insured reten-

tion qualifies as "other applicable liability insurance" under the Millers First policy's "other insurance" clause. The public policy factors cited in *Hillegass* are equally applicable in this case. Menard chose to retain its own risk for the first $500,000 per occurrence, and it therefore avoided paying premiums to a third-party insurer for that coverage. As in *Hillegass*, it would be "fundamentally unfair" to permit Menard to "escape both the expense of premium payments and the possibility of being held liable as primary insurer." *See id.* at 83. In addition, by virtue of its self-insured retention, Menard expected to be the primary insurer for the first $500,000 per occurrence. Allowing Menard to escape its obligation to provide primary coverage would be contrary to Menard's expectations. *See id.* at 83–84. Menard should not be able to "escape the liabilities that would attach to third-party insurers" simply because it chose to self-insure. *See id.* at 85.

¶ 26. Menard argues *Hillegass* is distinguishable because, unlike Burlington, Menard is a "premium paying insured with insurance." What Menard ignores, however, is that it is a "premium paying insured" only for damages in excess of $500,000. Menard did not pay any premiums for coverage within the self-insured retention amount.

¶ 27. Menard also argues *Hillegass* is distinguishable because Menard has a $500,000 self-insured retention, whereas Burlington was "self-insured" up to $1 million with a $2 million umbrella. Menard argues its self-insured retention is simply a "large deductible," and, therefore, it is not the same as self-insurance. However, there is at least one important difference between a self-insured retention and a deductible. When an insured has a deductible, the insurance company is typically required to provide a defense from

dollar one; in contrast, "the insured whose coverage is subject to a self-insured retention is usually obligated to retain its own defense counsel." *See* ANDERSON, *supra,* § 11.12. Here, the self-insured retention endorsement specifically requires Menard to pay its own defense costs until the self-insured retention amount is exhausted. Menard's self-insured retention is therefore distinct from a deductible.

¶ 28. Menard next observes that, in *Brown County v. OHIC Insurance Co.*, 2007 WI App 46, 300 Wis. 2d 547, 730 N.W.2d 446, this court concluded a self-insured retention did not qualify as "other insurance" for purposes of an "other insurance" clause. Menard argues *Brown County*, not *Hillegass*, controls. However, *Brown County* is distinguishable.

¶ 29. In *Brown County*, Tiffany Rohr died as a result of injuries she sustained while trying to escape from a county medical facility. *Brown Cnty.*, 300 Wis. 2d 547, ¶ 3. Rohr's estate sued the county, which had two insurance policies that provided coverage for the estate's claims. *Id.*, ¶¶ 4–6. The first policy, issued by Wisconsin Municipal Mutual Insurance Company, had a $5 million limit of liability and a self-insured retention of $100,000. *Id.*, ¶ 4. The second policy, issued by OHIC Insurance Company, had a $1 million limit of liability. *Id.*, ¶ 5. The county paid Wisconsin Municipal $100,000 to satisfy its self-insured retention. *Id.*, ¶ 6. Wisconsin Municipal and OHIC then settled the estate's claims, with both insurers contributing to the settlement. *Id.*

¶ 30. The county subsequently sued OHIC to recoup its $100,000 payment to Wisconsin Municipal. *Id.*, ¶ 7. The county argued reimbursement was required because the OHIC policy covered the estate's claims in full, without any deductible. *Id.* OHIC argued the

county was not entitled to reimbursement because its self-insured retention qualified as "other insurance" under the OHIC policy's "other insurance" clause. *Id.*

¶ 31. On appeal, we rejected OHIC's argument that the county's self-insured retention qualified as "other insurance." *Id.*, ¶ 10. We determined the OHIC policy's "other insurance" clause was ambiguous because it did not define the term "other insurance." *Id.*, ¶¶ 10, 12. We reasoned the county's self-insured retention operated "in exactly the same way as a deductible[.]" *Id.*, ¶ 16. We therefore held a reasonable insured in the county's position could have believed its self-insured retention was not "other insurance." *Id.*, ¶ 17.

¶ 32. In contrast, Menard's self-insured retention does not operate "in exactly the same way as a deductible[.]" *See id.*, ¶ 16. Unlike a deductible, Menard's self-insured retention requires Menard to pay its own defense costs until the self-insured retention amount is exhausted. Thus, unlike the insured in *Brown County*, a reasonable insured in Menard's position would not have concluded its self-insured retention did not qualify as "other applicable liability insurance" under the Millers First policy's "other insurance" clause.

¶ 33. In addition, the *Brown County* court concluded *Hillegass* was not controlling because *Hillegass* involved "a dispute between a self-insured party and an unaffiliated insurer," but *Brown County* involved "a dispute between a self-insured party and its own insurer." *Brown Cnty.*, 300 Wis. 2d 547, ¶ 18. The court explained, "All of the stated reasons for the court's conclusion in *Hillegass* were specific to a dispute between a self-insured party and an unaffiliated third party." *Brown Cnty.*, 300 Wis. 2d 547, ¶ 18. Unlike *Brown County*, this case involves a dispute between a

self-insured party and an unaffiliated insurer. Consequently, as in *Hillegass*, the relevant public policy factors favor a finding that Menard's self-insured retention qualifies as "other applicable liability insurance."

¶ 34. For instance, the *Brown County* court explained that, "when both a self-insured party and its insurer are liable for a loss, requiring the insurer to cover the loss does not allow the self-insured party to avoid both paying premiums and making payouts" because the self-insured party has paid the insurer premiums in exchange for coverage. *Brown Cnty.*, 300 Wis. 2d 547, ¶ 25. Accordingly, the self-insured party is not "attempting to foist its obligation on an unaffiliated third party by virtue of its self-insured status." *Id.*

¶ 35. In contrast, Menard has not paid any insurer premiums in exchange for coverage of Burgraff's claim. Menard has paid premiums only for coverage in excess of the $500,000 self-insured retention amount. It is undisputed that Burgraff's damages do not exceed that amount. Because Menard has avoided the expense of paying premiums, it would be "fundamentally unfair" to allow Menard to avoid being held liable as a primary insurer. *See Hillegass*, 176 Wis. 2d at 83.

¶ 36. The *Brown County* court also reasoned that, when an insured purchases two overlapping policies, the first of which includes a self-insured retention, the insured fully expects the second policy to provide coverage from dollar one, notwithstanding the other policy's self-insured retention. *Brown Cnty.*, 300 Wis. 2d 547, ¶ 26. As a result, allowing the insured to recover the self-insured retention amount from the second insurer is consistent with the insured's expectations and does not give the insured an unexpected windfall. *Id.*

¶ 37. Here, however, Menard did not purchase two overlapping policies. It purchased a single policy with a sizeable self-insured retention. Absent the Millers First policy, Menard would have fully expected to pay the first $500,000 of damages arising from Burgraff's injuries. Treating Menard as a primary insurer is therefore consistent with Menard's expectations. *See Hillegass*, 176 Wis. 2d at 83–84.

¶ 38. Finally, the *Brown County* court cited Wis. Stat. § 631.43(1) (2003–04), for the proposition that, "when two separate policies cover the same loss, an insured must be allowed to 'stack' the policies and receive the full benefit of both." *Brown Cnty.*, 300 Wis. 2d 547, ¶¶ 27–28. The court explained, "This is consistent with a general legislative intention that insureds receive the full benefit of all policies they purchase when those policies overlap." *Id.*, ¶ 28.

¶ 39. Again, Menard did not purchase overlapping policies. It purchased a single policy, and it is fortuitously entitled to coverage under a policy purchased by someone else. The legislative intent expressed in Wis. Stat. § 631.43(1) (2003–04), is therefore inapplicable.

¶ 40. In summary, the circuit court properly applied the "other insurance" clause from the Millers First policy. Contrary to Menard's assertion, the CNA policy's "other insurance" clause does not apply to Menard's self-insured retention. In addition, *Hillegass* supports the circuit court's conclusion that Menard's self-insured retention qualifies as "other applicable liability insurance" under the Millers First policy, and *Brown County* does not mandate a contrary result. Consequently, the court correctly apportioned responsibility for any settlement or verdict between Millers First and Menard in proportion to their limits of liability.

## II. Millers First's duty to defend

■

¶ 41. Menard next argues the circuit court erro-neously concluded Millers First no longer had a duty to defend Menard after it settled its one-sixth share of Burgraff's claim. "The duty to defend is a creature of contract. No Wisconsin statute prescribes a duty to defend or restricts its contractual limitation." *Novak v. American Family Mut. Ins. Co.*, 183 Wis. 2d 133, 137, 515 N.W.2d 504 (Ct. App. 1994). The Millers First policy states that Millers First "will settle or defend, as we consider appropriate, any claim or suit asking for [covered] damages." However, the policy goes on to state, "Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted. We are not obligated to provide defense after we have paid our limits of liability in settlement of claims or suits." (Boldface omitted.)

¶ 42. The Millers First policy unambiguously re-quires Millers First to provide a defense until its "limit of liability" has been exhausted. Menard argues the term "limit of liability" unambiguously refers to the $100,000 liability limit listed on the policy's declara-tions page. Because Millers First settled with Burgraff for only $40,000, Menard argues Millers First has not exhausted its limit of liability.

¶ 43. In contrast, Millers First argues it ex-hausted its limit of liability when it obtained a settle-ment discharging "one-sixth of any liability that Me-nard, Inc. may have to [Burgraff]" in exchange for $40,000. Millers First emphasizes that the policy re-quires it to provide a defense only until its "limit of liability *for this coverage* has been exhausted." (Empha-sis added.) Millers First argues the circuit court deter-

mined its coverage for Burgraff's claim was limited to one-sixth of any verdict or settlement. Millers First contends it has satisfied its obligation to pay one-sixth of Burgraff's claim, and, having done so, it can have no further duty to defend Menard.

██

¶ 44. We reject Millers First's argument for two reasons. First, the policy unambiguously requires Millers First to provide a defense for Menard until Millers First has exhausted its "limit of liability[.]" We agree with Menard that the only reasonable interpretation of the term "limit of liability" is the $100,000 limit of liability listed on the policy's declarations page. Consequently, under the unambiguous policy language, Millers First was required to provide a defense for Menard until it paid its $100,000 limit of liability.[4] Although the circuit court concluded Millers First would ultimately be responsible for one-sixth of any verdict or settlement, that conclusion is extraneous to the insurance policy and does not affect the unambiguous policy language. As Menard's counsel stated at oral argument, to conclude that the term "limit of liability" "appl[ies] to

---

[4] We acknowledge our supreme court has held that payment of an amount less than the policy limit can constitute exhaustion of an insurer's limit of liability under certain circumstances. *See Teigen v. Jelco of Wis., Inc.*, 124 Wis. 2d 1, 367 N.W.2d 806 (1985); *Loy v. Bunderson*, 107 Wis. 2d 400, 320 N.W.2d 175 (1982). However, in both *Teigen* and *Loy*, although the primary insurer settled for less than it policy limit, the settlement agreement provided that any recovery against the excess insurer would be credited in the full amount of the primary insurer's policy limit. *Teigen*, 124 Wis. 2d at 4; *Loy*, 107 Wis. 2d at 405. The settlement agreement between Burgraff and Millers First did not provide that any recovery against Menard would be credited in the amount of Millers First's $100,000 policy limit.

a court determination of responsibility after application of other insurance clauses as opposed to what the policy clearly indicates in the first instance" would be a "contorted" interpretation of the policy. Where policy language is unambiguous, we simply apply it as written. *Stubbe*, 257 Wis. 2d 401, ¶ 8. Further, even if the term "limit of liability" were ambiguous, we would construe it in Menard's favor. *See id.*

¶ 45. Second, Millers First's argument is foreclosed by *St. John's Home of Milwaukee v. Continental Casualty Co.*, 147 Wis. 2d 764, 434 N.W.2d 112 (Ct. App. 1988). There, St. John's Home, a nursing home, sued Becker Construction Company and Knuth Masonry, two of the contractors involved in the building's construction, alleging defects in the building's masonry. *Id.* at 769. The defendants' insurers moved for summary judgment, asserting they had no duty to defend or indemnify their insureds because the claimed damages were excluded from coverage. *Id.* The circuit court agreed in large part and granted the insurers partial summary judgment. *Id.* at 778. However, the court concluded the policies potentially covered St. John's Home's claims for $6,000 in earthwork and $5,400 in landscaping. *Id.*

¶ 46. One of Becker's insurers subsequently deposited $11,400 with the circuit court "as tender to St. John's to cover its maximum potential liability for St. John's claims against Becker." *Id.* at 779. All the insurers then moved for dismissal, arguing they had no further duty to defend their insureds because their maximum potential liability for the potentially covered claims had been satisfied. *Id.* at 779–80. The circuit court agreed and dismissed the insurers from the case. *Id.*

¶ 47. On appeal, Becker and Knuth argued that "even though the trial court determined [the insurers'] maximum potential liability under the CGL policies, and [one insurer] deposited that sum with the trial court, [the insurers] still had a duty to defend" their insureds against St. John's Home's claims. *Id.* at 780–81. We agreed, explaining:

> If an insurer owes any money at all under its insurance policy, it must defend, because Wisconsin is one of those states which requires an insurer to exhaust its total policy limits before it is freed from the duty to defend. Thus, an insurer in Wisconsin is not freed from the duty to defend until after it pays the maximum amount required under the insurance contract. We conclude that "maximum potential liability" cannot be equated with "maximum policy limits", and therefore a duty to defend exists even though an insurer tenders its "maximum potential liability" as [one of the insurers] did here.

*Id.* at 787.

¶ 48. In this case, the circuit court determined Millers First's maximum potential liability under its policy was one-sixth of Burgraff's damages. Millers First then settled its one-sixth share of Burgraff's claim for less than its $100,000 policy limit. As in *St. John's Home*, Millers First's payment of its maximum potential liability was insufficient to extinguish its duty to defend. *St. John's Home* clearly holds that payment of an insurer's maximum potential liability is not tantamount to an exhaustion of the insurer's policy limit.

¶ 49. The circuit court concluded it did not make sense, from a practical standpoint, to require Millers First to continue defending Menard after Millers First had fully paid its one-sixth portion of Burgraff's damages. The court observed that the Millers First policy

304

gives Millers First the right to "settle or defend, *as we consider appropriate,* any claim or suit asking for [covered] damages." (Emphasis added.) The court expressed disbelief that Menard would allow Millers First to continue controlling the defense when Millers First was no longer the party that would be responsible for paying any settlement or verdict.

¶ 50. What the circuit court failed to consider, though, was that while the policy gives Millers First the right to control the settlement and defense of Burgraff's claim, that right is tempered by Millers First's duty of good faith toward its insured. *See Roehl Transp., Inc. v. Liberty Mut. Ins. Co.*, 2010 WI 49, ¶¶ 41–43, 325 Wis. 2d 56, 784 N.W.2d 542. Failure to comply with that duty would expose Millers First to a bad faith claim. *See id.* The threat of a bad faith claim provides an incentive for Millers First to continue attempting to achieve a favorable result for Menard, even though Millers First is no longer the party required to pay any settlement or verdict.

■■

¶ 51. We therefore conclude the settlement with Burgraff did not extinguish Millers First's duty to defend Menard, and we reverse the order dismissing Millers First from the case. Menard further argues Millers First breached its duty to defend Menard by prematurely withdrawing its defense. Millers First does not dispute Menard's assertion that, assuming Millers First had a continuing duty to defend Menard following the settlement with Burgraff, it breached that duty by withdrawing its defense. Unrefuted arguments are deemed conceded. *See Charolais Breeding Ranches v. FPC Secs. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979). We therefore remand to the circuit court for a determination of Menard's damages.

¶ 52. Neither party shall receive appellate costs. *See* WIS. STAT. RULE 809.25(1).

*By the Court.*—Order affirmed in part; reversed in part and cause remanded for further proceedings.